UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-131-PLF |
| v. : | |
| : | |
| JASON GERDING, : | |
| : | |
| Defendant : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jason Gerding to 45 days' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### I.   Introduction

Defendant Jason Gerding, a 52-year-old systems analyst, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Defendant Jason Gerding pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case because Gerding and his wife (1) directly encountered law enforcement officers attempting to stop the mob and repel rioters, which included the use of tear gas and flash bangs; (2) nonetheless, chose to enter the Capitol building, joining

1

other rioters in chanting, "Whose house? Our house!" and "Let us in!" as he entered; (3) recorded the riot, including images of rioters breaking into the Capitol building, on his GoPro camera; (4) posed with his wife for a photo in the Rotunda, celebrating their presence inside the Capitol; (5) posted images to social media to boast about their participation in the attack on the Capitol; and (6) later told the FBI that in hindsight, he would go to Washington, D.C. again, and he was not sure he would do anything differently.

The Court must also consider that Jason Gerding's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Jason Gerding's crime support a sentence of 45 days' incarceration and 36 months' probation in this case.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 78 (Statement of Offense), at 1-3.

*Defendant Jason Gerding's Role in the January 6, 2021 Attack on the Capitol*

Jason Gerding and his wife, co-defendant Christina Gerding, booked flights and traveled from Illinois to Washington, D.C. to attend a rally in support of then-President Donald Trump, held the morning of January 6. After President Trump's speech, the Gerdings walked to the West Front of the U.S. Capitol Building, where they joined a group that had gathered as police stood behind bike racks to prevent entry into the Capitol. When they reached the back of the crowd at the West Front, Jason Gerding's GoPro captured the voice of one rioter shouting for the crowd to "Push forward," while another shouted that "We need more barricades!"

As the Gerdings moved closer to the Capitol, Jason Gerding observed and recorded the torn and damaged tarp that covered scaffolding for construction for the upcoming inauguration on the northwest side of the building.  In this recording, another rioter can be heard screaming at police, "We want tear gas! Give us some more!" Both recordings included images of rioters recovering from chemical irritants used for crowd control.

After the crowd overwhelmed the police line, the Gerdings moved with the mob to the Lower West Terrance, and then ascended to the Upper West Terrace, where they heard a high-pitched alarm.  Christina Gerding told Jason Gerding that the police might teargas them.  The Gerdings also saw people climbing onto the U.S. Capitol Building as they approached a door to the Capitol.



**Image 1: Screen shot from Jason Gerding's recording of the scene outside the Capitol building just before they breached it.  Jason Gerding (hand circled in red) points to rioters on ledges above them and tells Christina, "look, they're up on the – look up."  Christina Gerding is circled in blue.**

Instead of retreating, seconds later Jason Gerding told Christina Gerding, "let's go in," and Christina Gerding stated, "[t]hey are going to tear gas us." The couple then advanced to the Upper West Terrace door and joined with other rioters and began to chant, "Whose house? Our house" and "Let us in."

At approximately 2:34 p.m., Jason Gerding and Christina Gerding walked into an open door on the west side of the Capitol Building. Jason Gerding saw police as he walked into the Capitol Building. Once inside the Capitol Building, The Gerdings walked up the stairs into the Rotunda. There, they recorded themselves, posed for pictures, and posted the pictures on social media. In these recordings and photos, they appear to be celebrating their participation in the riot, as shown in one photograph, Image 2:



**Image 2: Picture of the defendant and his wife posted to social media**

At approximately 2:40 p.m., Jason Gerding and Christina Gerding left the Rotunda, and went to the first floor of the Capitol through the Memorial Door, and then walked through the Hall of Columns. At approximately 2:43 p.m., the Gerdings exited the Capitol through the South Door

4

Vestibule.  From approximately 2:44 p.m., Jason Gerding exchanged messages with a Facebook friend confirming that "Lots" of tear gas had been deployed and there were reports of someone getting shot inside the Capitol.  At approximately 5:14 p.m., he sent a message that "this is f***ing epic".

*Defendant Jason Gerding's FBI Interview*

On January 28, 2021, Jason Gerding participated in an interview with a Special Agent and a Task Force Officer for the Federal Bureau of Investigation.  During the interview, Gerding admitted that he and his wife went to the Capitol on January 6, and that he recorded the events on a GoPro camera.  He admitted that they could see and smell teargas as they approached the Capitol, and that they saw people who had entered the scaffolding, near the location for the inauguration. Gerding claimed he heard an officer say that the police were just letting people into the Capitol, since they were coming in anyway.  He also claimed that an officer told the people that that they had "proved their point," before directing them to leave the building.  Gerding admitted that he and his wife took a picture in front of the Declaration of Independence (John Turnbull's painting "The Declaration of Independence," displayed in the Rotunda). Jason Gerding denied that he observed any acts of violence but admitted that he heard a person in the scaffolding yelling, "Push forward.  Push forward."  He claimed that he and his wife were "caught in the moment."  He claimed to believe that they were being allowed into the Capitol.

Gerding stated that he and his wife went to Washington, D.C., to support Trump and followed Trump on social media and followed "Q" ideology for a period of time.  He stated that he had been disappointed with the 2020 election and believed it was stolen, but he denied that he went to Washington, D.C. to stop the counting of the electoral votes.  Gerding said that Christina Gerding found out that she had been fired from her job when they were at the airport to return from

Washington, D.C. He also stated that, in hindsight, he would go to Washington, D.C. again, and stated he was not sure he would do anything differently.

*The Charges and Plea Agreement*

On January 21, 2021, the United States charged Jason Gerding and Christina Gerding by criminal complaint with violating 18 U.S.C. § 1752(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building, and Parading; and 40 U.S.C. § 5104(e)(2)(G), Demonstrating, or Picketing in a Capitol Building,. On January 28, 2021, law enforcement officers arrested Jason Gerding at his home in Illinois.

On March 31, 2022, the United States charged Jason Gerding and Christina Gerding in a four-count Second Superseding Information, ECF 59, with violating 18 U.S.C. § 1752(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.

On January 31, 2023, pursuant to a plea agreement, Jason Gerding pleaded guilty to Count Four of the Information, charging him with the violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, he agreed to pay $500 in restitution to the Architect of the Capitol.[1]

---

[1] On January 31, 2023, Christina Gerding likewise pled guilty to violating Section 5104(e)(2)(G), and she will be sentenced by this Court on the same date that Jason Gerding is sentenced.

6

### III. Statutory Penalties

Jason Gerding now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 571 F.Supp.3d 1, 8 (D.D.C. 2021). While assessing Jason Gerding's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Jason Gerding, the absence of violent or destructive acts is not a mitigating factor. Had he engaged in such conduct, Gerding would have faced additional criminal charges.

One of the most important factors in this case is the fact that this defendant clearly knew that his actions on January 6, 2021 were wrong and illegal, as he and his wife knowingly defied law enforcement efforts to prevent rioters from entering the restricted area and Capitol grounds. By his own account, he knew that United States Capitol Police Officers were deploying significant efforts to prevent the invasion of the United States Capitol by the rioters on January 6. Jason and Christina Gerding admitted that they heard "high-pitched" alarms and that they were aware that police officers might use teargas against them. ECF 78 at 3-4; 80 at 3-4. In fact, as recorded on Jason Gerding's GoPro, they saw the effects of tear gas on others as they approached the Capitol building through the grounds of the restricted area on January 6. They encountered uniformed police officers in riot gear and the deployment of non-lethal deterrents, like teargas. Law-abiding persons who respect the lawful function of our government and our laws would not have acted as they did. Their decision to invade the Capitol, as part of a mob effort to prevent the certification of the 2020 election are part of a horrific offense and terrible chapter in this nation's history. The fact that Jason Gerding has not shown remorse for his actions and other events which injured police officers and claimed lives adds to the seriousness of the offense. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days incarceration in this matter.

### B. Jason Gerding's History and Characteristics

Jason Gerding has a minor criminal history consisting of a 1988 conviction for fighting and convictions in 1996 and 1998 for driving under the influence, as well as convictions for minor traffic violations. ECF 82, at 9-10. He was arrested in 2013 for financial exploitation of a disabled adult, but the charge was dismissed.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

9

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The specific nature of the offense in this case, which involves the defendant's participation in a violent attack on the Capitol and the peaceful function of government in the United States, as well as the absence of any remorse demonstrated by this defendant, show that the need for deterrence is a significant consideration in determining the appropriate sentence in this case. Here, the defendant's brazen and arrogant disregard for the law and the efforts of law enforcement officers to protect the Capitol and the members of Congress reflect that he is willing to violate the law and engage in conduct that is dangerous to others, including uniformed police officers. The fact that his actions as part of an overwhelming mob threatened the safety of uniformed police officers, and members of Congress and their staff, underscores the need for specific deterrence, as does the fact that the defendant and Christina Gerding posted their actions on social media accounts

10

and even bragged about their participation, despite the harm caused by the rioters on January 6. Notably, even much later, Jason Gerding still showed no remorse and told the FBI that he would go to Washington D.C. again and that he was not sure he would do anything differently.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Jason Gerding based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Jason Gerding has pleaded guilty to Count Four of the Superseding Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

11

guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section

3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense

13

is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mazzocco*, 21-cr-54-TSC, Mazzocco posed for a photograph in front of rioters forcing their way into the Capitol, treating the breach as if it were a spectacle. He remained in the Capitol for 12 minutes, only slightly longer than the Gerdings, and like the Gerdings, traveled to more than one location inside of the Capitol. After January 6, Mazzocco deleted his social media posts and concealed a camera he used to record the events of that day; nevertheless, in text messages, he claimed that there was no riot on January 6 and he only protested a stolen

election, insisting that nothing wrong had occurred.  Mazzocco pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 45 days' incarceration.

In *United States v. Hemenway*, 21-cr-49-TSC, like the Gerdings, Hemenway treated the event of January 6 like an entertainment, taking a selfie-style photograph in the middle of a mob with his middle finger raised.  He remained in the Capitol for 17 minutes, only six minutes longer than Jason Gerding, entering through the Senate Wing Door and then making his way to the Crypt, where he took the selfie-photo showing not only his middle finger but his elation during the breach of the Capitol.  Unlike Jason Gerding, Hemenway had a serious criminal history; however, also unlike him, Hemenway not only admitted to his actions, but accepted responsibility through an early plea agreement; moreover, unlike Jason Gerding, Hemenway expressed remorse for his actions.  Hemenway pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 45 days' incarceration.

In that same case, Hemenway's codefendant Robert Bauer also treated the events of January 6 like an entertaining spectacle, entered the Capitol with Hemenway through the Senate Wing Door, traveled inside the Capitol to the Crypt, and posed with elation in the same photograph with Hemenway.  Bauer, who also had a serious criminal history, admitted to his actions only two days after the riot and accepted responsibility through an early plea agreement, although he did not express true remorse to the agents who questioned him, expressing his belief that he did nothing wrong.  Bauer entered a guilty plea to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 45 days' incarceration.

In *United States v. Paul Westover*, 21-cr-697-JEB, Westover, who lacked any criminal history, (unlike Jason Gerding, who has some), was aware that officers were trying to disperse the crowd outside the Capitol, yet still proceeded toward the building; breached police lines; entered

the Capitol through a broken window; made his way to the Speaker's suite, and then left the Capitol through a broken window; celebrated the theft of government property; deleted photos and videos from his phone and Facebook account, and like Jason Gerding, lacked remorse following the riot. Westover pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 45 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[3]

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have


## V.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and

---

consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA)

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

of restitution owed to the victim(s), <u>see</u> 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Jason Gerding to pay $500 in restitution for his convictions on Count Four. This amount fairly reflects Gerding's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration, 36 months of probation, 60 hours of community service, and a $500 restitution payment. Such a sentence protects the community, promotes respect for the law, and deters

future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              United States Attorney
                              D.C. Bar No. 481052

By:    s/ *Christopher Brunwin*
          Assistant United States Attorney
          California Bar No. 158939
          United States Attorney's Office
          Central District of California
          312 N. Spring Street
          Los Angeles, California 90012
          (213)894-4242
          christopher.brunwin@usdoj.gov

          Nialah S. Ferrer
          Assistant United States Attorney
          New York Bar No. 5748462
          United States Attorney's Office
          601 D Street, N.W.
          Washington D.C. 20001
          (202)557-1490
          nialah.ferrer@usdoj.gov