**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-131-PLF** |
| **v.** | : | |
| | : | |
| **CHRISTINA GERDING,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christina Gerding to 30 days' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

**I.      Introduction**

Defendant Christina Gerding, a 48 year-old Volunteer Coordinator and Administrative Assistant, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Defendant Christina Gerding pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case, because Gerding: 1) remained on the Capitol grounds despite police efforts to disperse the crowd she had joined; 2) entered the Capitol building despite her awareness of efforts by United States Capitol Police to prevent access, including her

1

awareness of alarms, teargas, and police presence; 3) she trespassed inside the Capitol for more than 10 mintues; 4) while inside, she celebrated her unlawful entry; and 5)  she later posted images on social media accounts to brag about her illegal actions. The Court must also consider that Christina Gerding's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Christina Gerding's crime support a sentence of 30 days' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

The Court should consider that Gerding's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, Gerding's participation in a riot that succeeded in halting the Congressional certification of the election results renders a significant jail sentence both necessary and appropriate.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 78 (Statement of Offense), at 1-3.

### Defendant Christina Gerding's Role in the January 6, 2021 Attack on the Capitol

Christina Gerding and her husband, Jason Gerding, booked flights and traveled from Illinois to Washington, D.C. to attend a rally in support of then-President Donald Trump, held the morning of January 6.    After President Trump's speech, the Gerdings walked to the West Front of the  U.S. Capitol Building,  where they joined a group that had gathered as police stood behind

bike racks to prevent entry into the Capitol.  When they reached the back of the crowd at the West Front, Jason Gerding's GoPro captured the voice of one rioter shouting for the crowd to "Push forward," while another shouted that "We need more barricades!"

As the Gerdings moved closer to the Capitol, Christina Gerding and her husband could view the torn and damaged tarp that covered scaffolding for construction for the upcoming inauguration on the northwest side of the building.  The Gerdings continued towards the Capitol together as Jason Gerding recorded their progress, capturing the voice of another rioter as he screamed at police, "We want tear gas! Give us some more!" Both recordings included images of rioters recovering from chemical irritants used for crowd control.

Rioters were able to force they way past police officers attempting to prevent the mob from accessing steps next to and under scaffolding.  The Gerdings joined the crowd following the rioters who overwhelmed these police lines, and moved with the crowd to past the Lower and then to the Upper West Terrace of the Capitol. As the Gerdings walked across the Upper West Terrace, they heard a high-pitched alarm, and Christina Gerding told her husband that law enforcement might teargas them.  Christina and Jason Gerding also saw people climbing onto the U.S. Capitol Building as they approached the Upper West Terrace door to the Capitol.

Image 1



**Image 1:Screen shot from Jason Gerding's recording of the scene outside the Capitol building just before they breached it.  Jason Gerding (hand circled in red) points to rioters on ledges above them and tells Christina, "look, they're up on the – look up." Christina Gerding  is circled in blue.**

Instead of retreating, seconds later Jason Gerding told Christina Gerding, "let's go in," and Christina Gerding stated, "[t]hey are going to teargas us."  With other rioters, Christina and Jason Gerding began to chant, "Whose house? Our house." and "Let us in."  The crowd of rioters significantly outnumbered the four officers guarding the Upper West Terrace door, who retreated from from the unequal confrontation.  Despite the warning she had just provided to her husband, Christina Gerding entered the Capitol through the Upper West Terrance door and, joining her husband and the other rioters, breached that entrance.  The Gerdings entered through the Upper West Terrace door at approximately 2:34 p.m, passing uniformed officers.

Once inside the Capitol Building,  the Gerding's walked up the stairs into the Rotunda. There, they recorded themselves, had photographs taken of themselves, and sent them to others.

In these recordings and photos, they appear to be celebrating their participation in the riot, as shown in one of these photographs, Image 2, below:



**Image 2:  One of the photographs Jason Gerding and Christina Gerding sent to others.**

At approximately 2:40 p.m.,  the Gerding's left the Rotunda, and went to the first floor of the Capitol through the Memorial Door, and then walked through the Hall of Columns.    At approximately 2:45 p.m., they exited from the Capitol  through the South Door Vestibule.[1]

*The Charges and Plea Agreement*

On January 21, 2021, the United States charged  Christina and Jason Gerding by criminal complaint  with  violating  18  U.S.C.  §  1752(a)(1),  Knowingly  Entering  or  Remaining  in  any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds; 40 U.S.C.

---

[1] In his Statement of Offense, Jason Gerding estimated the time as approximately 2:43 p.m.  ECF No. 78.  Footage from security cameras more precisely shows the Gerdings exited at 2:45 p.m.

§ 5104(e)(2)(D), Disorderly Conduct in a Capitol Building, and and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building. On January 28, 2021, law enforcement officers arrested Christina Gerding at her home in Illinois. On March 31, 2022, the United States charged Christina Gerding and Jason Gerding in a 4-count Second Superseding Information with violating 18 U.S.C. § 1752(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.

On January 31, 2023, pursuant to a plea agreement, Christina Gerding pleaded guilty to Count Four of the Second Supserseding Information, charging her with the violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, she agreed to pay $500 in restitution to the Architect of the Capitol.[2]

### III.    Statutory Penalties

Christina Gerding now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, she faces up to six months of imprisonment and a fine of up to $5,000. She  must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[2] On January 31, 2023, Jason Gerding likewise pled guilty to violating Section 5104(e)(2)(G), and he will be sentenced by this Court on the same date that Christina Gerding is sentenced.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days incarceration and a $500 restitution payment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 571 F.Supp.3d 1, 8 (D.D.C. 2021). While assessing Christina Gerding's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Christina Gerding, the absence of violent or destructive acts is not a mitigating factor. Had she engaged in such conduct, Gerding would have faced additional criminal charges.

One of the most important factors in this case is the fact that this defendant would have plainly seen how wrongful her conduct was on January 6, 2021.  By her own account, *see* ECF 80 at 3-4, and as recorded on her husband's GroPro, she knew that United States Capitol Police Officers were deploying significant efforts to prevent the invasion of the United States Capitol by the rioters on January 6.  Christina Gerding admitted that she heard "high-pitched" alarms. ECF 80 at 3.  As she approached the Capitol building, Christina Gerding warned her husband that police officers might use teargas against them. *Id*. at 3-4.  The Gerdings  encountered  uniformed police officers in riot gear and rioters recovering from the deployment of teargas.  Law-abiding persons who respect the lawful function of our government and our laws would not have acted as they did

by trespassing into the Capitol.  Christina Gerding's decision to invade the Capitol, as part of a

mob effort to prevent the certification of the 2020 election is part of a horrific offense and terrible

chapter in this nation's history.  Christina Gerding has not shown remorse for her actions or the

events which injured police officers and claimed lives.  Accordingly, the nature and the

circumstances of this offense establish the clear need for a sentence of 30 days' incarceration   in

this matter.

### B.  Christina Gerding's History and Characteristics of Defendant

Defendant Christina Gerding has no criminal history.  She does have a college degree and

has been employed regularly since 2000.  In that time, she worked as an assistant sales manager,

program manager and independent contractor.  She is currently employed as a Volunteer

Coordinator and administrative assistant.  ECF 83 at 11.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As

with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United

States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is

usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The specific nature of the offense in this case, which involves the defendant's participation in a violent attack on the Capitol and the peaceful function of government in the United States, as well as the absence of any remorse demonstrated by this defendant, show that the need for deterrence is a significant consideration in determining the appropriate sentence in this case.  Here, the defendant's disregard for the law and the efforts of law enforcement officers to protect the Capitol and the members of Congress reflect that she is willing to violate the law and engage in conduct that endangers others, including law enforcement officers.  The fact that her actions as part of an overwhelming mob endangered the safety of uniformed police officers, members of Congress and staff underscores the need for specific deterrence, as does the fact that the defendant sent images of her actions to others, despite the harm that had been done by those who overtook the Capitol on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Christina Gerding based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Christina Gerding has pleaded guilty to Count Four of the Superseding Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing

uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by

sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Schaefer*, 22-cr-69-TFH , Jeffrey Schaefer  entered the Capitol through a broken window; chanted with other rioters in the Senate Wing foyer; went to the Crypt and into a conference room/meeting room and took photos of both, which he posted to his social media; and even days later, minimized the riot on social media.  The court sentenced him to 30 days' incarceration.

 Similarly, in *United States v. Chance Uptmore*, 21-cr-149 (RCL), the defendant watched rioters fight with and overtake police who had been holding the Northwest Stairs; paraded up those breached stairs, and chose to enter the Capitol Building despite having seen police deploying tear gas against the rioters and rioters using chemical spray against police; entered the Upper West Terrace Doors which had been breached only three minutes earlier; was present in that hallway when an officer deployed tear gas to disperse the mob; took videos and photographs of the violence, property damage and tear gas; posted on his Facebook page later that day that "the violence was minimal" and "The cops were saying stuff like 'we stand with you' and 'thanks for being here'"; and deactivated his social media account in the weeks shortly thereafter.  The court sentenced the defendant to 30 days' imprisonment.

In *United States v. Andrew Galloway,* 22-cr-12 (CRC), the defendant breached the U.S. Capitol through a broken window near the Senate Wing Doors within approximately 11 minutes of the initial breach; travelled to the Crypt before exiting the Capitol, after spending approximately

14

10 minutes inside; made false self-exonerating statements to FBI agents about his participation in the riot; and loudly and publicly expressed his support for the riot shortly after leaving the Capitol building.  When interviewed by the FBI, he denied having entered the Capitol, and did not express remorse.  A search of Galloway's phone showed that even after January 6, Galloway actively followed communications from the Proud Boys.

United States v. Sarko, 21-cr-591-CKK, also involved a defendant who observed rioters make a violent entry into the Capitol, including by breaking a window and then climbing through the window as the rioters committed property damage to make entry to the Capitol; proudly recorded himself outside of the Capitol, exclaiming "We are storming the Capitol out here"; "Where are the traitors"; "Bring out Pelosi!"; "We won't let you steal this country"; "We're actually breaking in right now"; and "Fight for Trump!"  The defendant entered the office of United States Senator Jeff Merkley without authorization; entered a room used by visiting spouses of U.S. Senators and members of the House of Representatives without authorization; and chanted and cheered while approaching the Capitol and posted a video to Snapchat of his conduct inside and outside of the U.S. Capitol. The court sentenced that defendant to 30 days' imprisonment.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) i "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." United States v. Coppola, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." United States v. Gardellini, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.[4]

## V.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

---

[4] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA)

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

17

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here. More specifically, the Court should require Christina Gerding to pay $500 in restitution for his convictions on Count Four. This amount fairly reflects Gerding's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months of probation, 60 hours of community service, and a $500 restitution payment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ *Christopher Brunwin*
Assistant United States Attorney
California Bar No. 158939
United States Attorney's Office
Central District of California
312 N. Spring Street
Los Angeles, California 90012
(213)894-4242
christopher.brunwin@usdoj.gov

Nialah S. Ferrer
Assistant United States Attorney
New York Bar No. 5748462
United States Attorney's Office
601 D Street N.W.
Washington D.C. 20001
(202)557-1490
nialah.ferrer@usdoj.gov

</div>